

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00088-CV

_____

BRAZOS VALLEY ROADRUNNERS, LLC, Appellant

V.

RANDALL HARGROVE, Appellee

On Appeal from the County Court at Law No. 2
Brazos County, Texas
Trial Court No. 6125-B

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

OPINION

Randall Hargrove parked his pickup truck in the Coyote Parking Lot (Lot) owned by Dixie Chicken, Inc. Realizing that he did not have a five-dollar bill to pay the parking fee, Hargrove "walked less than 200 feet to an adjacent outdoor market to exchange a larger bill . . . [and] immediately returned to the metal [pay] box and deposited a five-dollar bill in the appropriate slot." Even so, Brazos Valley Roadrunners, LLC (Roadrunners), towed Hargrove's pickup truck, requiring him to pay $297.50 to retrieve his vehicle. Pursuant to the Texas Towing and Booting Act (the Act), Hargrove sued Dixie Chicken and Roadrunners for removal of a vehicle without probable cause. Hargrove filed a request for a tow hearing before the Justice of the Peace Court (JP Court) and obtained a default judgment in his favor.

Dixie Chicken and Roadrunners appealed the JP Court's decision to the County Court at Law No. 2 of Brazos County, Texas (trial court), which also determined that Hargrove proved his claim that Roadrunners and Dixie Chicken towed his vehicle without probable cause or the proper signage required by the Act.[1] *See* TEX. OCC. CODE ANN. § 2308.001.[2] As a result, the trial court entered judgment in favor of Hargrove, including $297.50 in actual damages, $48.46 for costs of court, and post-judgment interest at five percent. Roadrunners appeals.[3]

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[2]"Section 2308.459 of the code provides for an appeal from the justice court's decision," *Badaiki v. Miller*, No. 14-17-00450-CV, 2019 WL 922289, at *3 (Tex. App.—Houston [14th Dist.] Feb. 26, 2019, no pet.) (mem. op.) (citing TEX. OCC. CODE ANN. § 2308.459), and "[a]ppeals from justice courts are tried de novo in county court." *Id.* (citing TEX. R. CIV. P. 506.3).

[3]Dixie Chicken is not a party to this appeal.

2

Because we conclude that legally and factually sufficient evidence supports the trial court's judgment, we affirm it.

## I.      The Act

This case is governed by the Act.  Under the Act, "[t]he owner or operator of a vehicle that has been removed and placed in a vehicle storage facility . . . is entitled to a hearing on whether probable cause existed for the removal and placement . . . ."  TEX. OCC. CODE ANN. § 2308.452.  The hearing takes place in a JP Court, and if probable cause is not found, the towing company or parking facility owner must "reimburse the owner or operator for the cost of the removal and storage paid by the owner or operator."  TEX. OCC. CODE ANN. §§ 2308.451, 2308.453.

Also, Chapter 2308 contains requirements for proper signage.  In relevant part, Section 2308.252 of the Act states:

> (a)      A parking facility owner may, without the consent of the owner or operator of an unauthorized vehicle, cause the vehicle and any property on or in the vehicle to be removed and stored at a vehicle storage facility at the vehicle owner's or operator's expense if:
>
>> (1)      signs that comply with Subchapter G prohibiting unauthorized vehicles are located on the parking facility at the time of towing and for the preceding 24 hours and remain installed at the time of towing;
>>
>> (2)      the owner or operator of the vehicle has received actual notice from the parking facility owner that the vehicle will be towed at the vehicle owner's or operator's expense if it is in or not removed from an unauthorized space; [or]
>>
>> (3)      the parking facility owner gives notice to the owner or operator of the vehicle under Subsection (b) . . . .

TEX. OCC. CODE ANN. § 2308.252(a).  In relevant part, Subchapter G states,

3

(a)　.　.　.　[A]n unauthorized vehicle may not be towed under Section 2308.252(a)(1) . . . unless a sign prohibiting unauthorized vehicles on a parking facility is:

> (1)　facing and conspicuously visible to the driver of a vehicle that enters the facility;
>
> (2)　located:
>
> > (A)　on the right or left side of each driveway or curb-cut through which a vehicle can enter the facility, including an entry from an alley abutting the facility; or
> >
> > (B)　at intervals along the entrance so that no entrance is farther than 25 feet from a sign . . . .
>
> . . . .

(b)　. . . [A]n unauthorized vehicle may be towed under Section 2308.252(a)(1) . . . only if each sign prohibiting unauthorized vehicles:

> . . . .
>
> (3)　contains the international symbol for towing vehicles;
>
> . . . .
>
> (5)　bears the words, as applicable:
>
> > (A)　"Unauthorized Vehicles Will Be Towed or Booted at Owner's or Operator's Expense"; [or]
> >
> > (B)　"Unauthorized Vehicles Will Be Towed at Owner's or Operator's Expense";
> >
> > . . . .
>
> (6)　contains a statement of the days and hours of towing and booting enforcement; and

4

> (7)      contains a number, including the area code, of a telephone that is answered 24 hours a day to enable an owner or operator of a vehicle to locate a towed vehicle . . . .

TEX. OCC. CODE ANN. § 2308.301. If a towing company or parking facility owner violates Chapter 2308, the owner of the vehicle is entitled to recover damages arising from and fees assessed in the vehicle's removal or storage. TEX. OCC. CODE ANN. § 2308.404.

## II.      Factual and Procedural Background

At trial, Hargrove testified that he saw no signs before he parked in the Lot at approximately 7:30 p.m. After parking, he walked to the portion of the Lot where he thought patrons were supposed to pay and saw a "big sign" notifying patrons "to pay before leaving the parking place." The sign also said, "IF YOU PARK AND DON'T PAY[,] YOUR VEHICLE WILL BE TOWED AT OWNER'S EXPENSE." Another sign read, "GET YOUR CHANGE BEFORE YOU PARK," "PARK BEFORE YOU PAY," "PAY BEFORE YOU WALK AWAY *OR YOU WILL BE TOWED*," but Hargrove testified that he did not see that sign.

Hargrove said that he only had $20.00 bills, the parking fee was $5.00, and the Lot had no means of making change. Hargrove interpreted the "pay before leaving" sign that he saw to mean that a person would be towed if they forgot to pay, thought the lot was free and did not pay, or "walk[ed] away without paying." After others in the lot said they had no change either, Hargrove decided to get change nearby.

To stay within range of the Lot's cameras, Hargrove walked "like 20 feet from the actual parking place," obtained change from a concession stand, and walked right back to the pay box to deposit a five-dollar bill into the slot that corresponded to the number assigned to his parking

5

space. Hargrove testified that it only took "three minutes max" to go find change and return to the Lot. Hargrove said, "I put [the money] in the slot, first looking up at the camera, and showing the camera." After paying, Hargrove confirmed that his truck was still in the parking space and walked away.[4]

When he returned to the parking lot at about 8:35 p.m., his truck was not in the Lot. Hargrove called the number on the sign and spoke to an employee who provided instructions on how to retrieve the truck. Hargrove asked the employee to show him the video recording from the Lot so he could prove to her that he had paid the parking fee. The employee was unable to help Hargrove and told him that he could take up the matter with her employers. Left with no choice, Hargrove paid the $297.50 fee and went home in his truck. The receipt was introduced into evidence.

Hargrove called Roadrunners the next day to demand an explanation as to why he was towed even after he had paid and said that the woman on the other end of the line "yelled, curs[ed him], and then hung up." Hargrove decided to call someone at Dixie Chicken, which owned the Lot, and asked a manager for the camera footage. According to Hargrove, the manager said that the cameras did not work and were just there to deter people from leaving the Lot without paying. Hargrove called Dixie Chicken's corporate office to get answers but received none. Even so, still photos from the Lot's cameras and video footage of Hargrove before he returned to the Lot were produced by Roadrunners, which demonstrated that the Lot's cameras were working.

---

[4]Hargrove confirmed that, before he left the Lot, there was not a slip of paper on his truck warning that he would be towed.

6

Hargrove said that the signs in the Lot were "misleading and deceivious [sic]." When asked to explain why, Hargrove said, "Clearly, I parked and I paid. It doesn't say if you walk off the curb and get change, you're subject to get towed." He added that Roadrunners and Dixie Chicken would have known he had only walked off the lot for a few minutes before returning to pay if they were watching the cameras. Timestamps from the photographs of Hargrove in the Lot confirmed that he had only taken approximately three minutes to get change and return to the pay box.

Sandra Portzer, one of Roadrunners' owners, testified that video recordings from the Lot's cameras were only saved for twelve days, that she set aside the recording of Hargrove, but did not save any portion of the recording after Hargrove left the parking lot to make change because she did not believe it was relevant. Portzer claimed that she was unaware that Hargrove had disputed the tow until she received his request for a tow hearing.

Portzer acknowledged that, pursuant to its contract with Dixie Chicken, Roadrunners was responsible for monitoring the Lot. Portzer claimed, "Because of the way that we are able to monitor . . . the lot, we -- we cannot keep track of people once they leave the property to see if they get change and come back" because "once they leave the lot, we're through watching. We need to watch the next car or the next person." Portzer added that "many of [their] cameras are overhead," that it is "hard to recognize individuals," and that, "when you are watching the pay box to see who comes back, you can't be watching the rest of the cameras," but admitted that they had "several different cameras for different angles."

7

Portzer said that Dixie Chicken makes the rules for the Lot, that their contract with Dixie Chicken allowed for towing "unauthorized vehicles," but that the contract did not define that term and, instead, "[left] it open with suggestions of what can be towed." Portzer said that Roadrunners had discretion not to tow someone if they saw the person had come back to the Lot to pay the parking fee, but that it did not collect the parking fees and had no access to the pay box, which belonged to Dixie Chicken. Portzer also said that the Lot did not provide any receipt for payment.

As for the requirements for Subchapter G, Portzer admitted that the Lot's signs did not have the international symbol for towing and did not contain the phrase "unauthorized vehicles will be towed or booted at the owner's expenses." Protzer also said that signs were not placed in front of any parking spots and agreed that Roadrunners did not give notice to Hargrove before towing.

The trial court entered the following findings of fact, among others:

- "Hargrove left the Coyote Lot for fewer than five minutes before returning, at which point he paid five dollars into the payment receptacle at the Coyote Lot."

- "Hargrove's vehicle had not yet been towed when he paid."

- "Neither defendant spoke to Hargrove or posted notice on his vehicle before his vehicle was towed."

- "Brazos Valley Roadrunners maintains surveillance of the Coyote Lot with multiple surveillance cameras[, and] [a] viewer of those surveillance cameras should have seen Hargrove return and make payment."

- "Multiple signs solely containing the statement, 'Get your change before you park[,] park before you pay[,] pay before you walk away or you will be towed' are posted near the entrances to the Coyote Lot."

8

- "One sign reading solely 'Coyote Parking Lot,' 'Notice,' 'Place money in numbered slot that matches your parking space or you will be towed[]' and 'Pay before you walk away' is posted facing into the Coyote Lot where it cannot be viewed from the street or the entrances."

- "None of the aforementioned signs contain the international symbol for towing vehicles."

- "None of the aforementioned signs bear the words 'Unauthorized Vehicles Will be Towed at Owner's or Operator's Expense,' or any variation of those words."

- "None of the aforementioned signs contains a statement of the days and hours of towing and booting enforcement"; "None of the aforementioned signs contains a telephone number to enable an owner or operator of a vehicle to locate a towed vehicle."

- "Authorized use of the Coyote Lot . . . was conditioned solely on reasonably prompt payment of $5," and

- "Hargrove's use of the Coyote Lot . . . was authorized because he completed reasonably prompt payment of $5."

As a result of its findings, the trial court concluded that the Lot's signs did not comply with Subchapter G of the Act and that Roadrunners lacked probable cause to tow Hargrove's vehicle because the Lot lacked proper signage and "they should have known that Hargrove's vehicle was not unauthorized."

In its motion for new trial, Roadrunners argued that the trial court's findings were not supported by legally or factually sufficient evidence because signs warned patrons of the Lot to get change before parking and to "pay before [they walked] away." The trial court denied the motion for new trial. On appeal, Roadrunners argues that the trial court's findings were not supported by legally and factually sufficient evidence.

9

## III. Standard of Review

Because the trial court issued findings of fact and conclusions of law in this case after a bench trial, "the trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's finding." *Davidson v. McLennan Cty. Appraisal Dist.*, No. 10-11-00061-CV, 2012 WL 3799149, at *2 (Tex. App.—Waco Aug. 30, 2012, pet. denied) (mem. op.) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). "We review the trial court's conclusions of law de novo." *Id.* (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). "As the reviewing court, we may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.* (citing *Marchand*, 83 S.W.3d at 794). "In reviewing a finding for legal sufficiency, we credit evidence that supports the finding if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* (citing *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "In reviewing a factual sufficiency issue, the court of appeals must weigh all of the evidence in the record." *Id.* (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam)). "Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust." *Id.* (citing *Ortiz*, 917 S.W.2d at 772).

## IV. Analysis

Roadrunners argues that it had probable cause to tow because Hargrove left the Lot for a few minutes before returning to pay and the Lot's rules clearly required a person to pay before

walking away from the Lot.[5] The evidence at trial showed that Hargrove left the Lot for less than five minutes to retrieve cash to pay the parking fee. Even assuming Hargrove's brief departure led to his vehicle becoming temporarily unauthorized, Chapter 2308 only permits the towing of an unauthorized vehicle, and it is undisputed that Hargrove returned and quickly paid the fee before finally leaving the Lot.[6] As a result, sufficient evidence supported the trial court's findings that "[a]uthorized use of the Coyote Lot . . . was conditioned solely on reasonably prompt payment of $5," and "Hargrove's use of the Coyote Lot . . . was authorized because he completed reasonably prompt payment of $5." Even though Hargrove's truck was authorized to park in the Lot after payment, Roadrunners still towed it.[7] Based on the evidence in this case, we conclude that the trial court's finding that Roadrunners lacked probable cause to tow was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. As a result, legally and factually sufficient evidence supported this finding.

Also, Hargrove's vehicle was subject to towing without consent only if (1) the Lot had signs that complied with Subchapter G, (2) Hargrove received actual notice from Dixie Chicken

---

[5]The term "probable cause" is not defined under Chapter 2308.305. In the context of a tow conducted by a police officer, courts have applied the criminal definition of probable cause. *See Wilt v. City of Greenville Police Dep't*, No. 06-10-00107-CV, 2011 WL 1600509, at *1 (Tex. App.—Texarkana Apr. 29, 2011, no pet.) (mem. op.); *Senter v. City of Dallas*, No. 05-05-01416-CV, 2006 WL 3218548, at *2 (Tex. App.—Dallas Nov. 8, 2006, no pet.) (mem. op.). Even assuming, without deciding, that the criminal definition of probable cause applied, probable cause must exist "at the moment the arrest is made," and Roadrunners has provided us with no authority that rebuts the position that there must be probable cause at the time of the tow. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). Here, it was undisputed that Hargrove paid the fee before the tow, and the trial court ruled, based on the evidence that Roadrunners had employees watching the surveillance recording, that Roadrunners should have seen Hargrove make that payment.

[6]We limit our holding to the facts of this case and express no opinion on whether a towing company or parking facility owner would have probable cause to tow if a longer time elapsed between parking and payment.

[7]As the fact-finder, the trial court was free to disbelieve Portzer's testimony that Roadrunners could not monitor the Lot after someone left the property because the surveillance cameras were working, photos introduced into evidence showed that a person could be easily identified, and there was evidence that a paid employee monitored the footage.

11

that the vehicle would be towed at the vehicle owner's or operator's expense if it was "in or not removed from an unauthorized space," or (3) Dixie Chicken gave notice to the owner or operator of the vehicle under Section 2308.252(b). TEX. OCC. CODE ANN. §§ 2308.252, 2308.301. Roadrunners argues that Hargrove received actual notice under Section 2308.252(a)(2) due to the signs posted in the Lot warning him to pay before walking away. Despite the Lot's warning, there is a difference in the Act between an unauthorized vehicle parked in an authorized space and a vehicle parked in an unauthorized space, such as one in which no parking is allowed or parking is reserved for a specified group. Because the evidence did not show that Hargrove was parked in an unauthorized space, and the evidence supported the trial court's finding that "[n]either defendant spoke to Hargrove or posted notice on his vehicle before his vehicle was towed," nothing showed that he received actual knowledge as required by Section 2308.252(a)(2).

Roadrunners also argues that the sign met the requirements of providing notice under Section 2308.252(b). However, the relevant portions of that Section plainly read,

> (b)  A parking facility owner is considered to have given notice under Subsection (a)(3) if:
>
>> (1)  a conspicuous notice has been attached to the vehicle's front windshield or, if the vehicle has no front windshield, to a conspicuous part of the vehicle stating:
>>
>>> (A)  that the vehicle is in a parking space in which the vehicle is not authorized to be parked;
>>>
>>> (B)  a description of all other unauthorized areas in the parking facility;

12

(C)     that the vehicle will be towed at the expense of the owner or operator of the vehicle if it remains in an unauthorized area of the parking facility; and

(D)     a telephone number that is answered 24 hours a day to enable the owner or operator of the vehicle to locate the vehicle . . . .

TEX. OCC. CODE ANN. § 2308.252(b)(1).  Because the evidence at trial established that Hargrove did not receive the notice described by subsection (b)(1) of Section 2308.252, he did not receive notice under subsection (a)(3).

As a result, Roadrunners was required to show that the Lot's signs complied with Subchapter G.  Section 2308.301(a) described where the signs must be posted, and Section 2308.301(b) states that an unauthorized vehicle can be towed "only if *each* sign prohibiting unauthorized vehicles" contains required information, including the international symbol for towing, a statement that unauthorized vehicles will be towed at the owner's expense, the days and hours of towing enforcement, and a telephone number enabling a vehicle owner or operator to locate a towed vehicle at any time of the day.  TEX. OCC. CODE ANN. § 2308.301(b) (emphasis added).  The trial court found that the signs on the Lot did not comply because, among other things, (1) the information required by Section 2308.301(b) was not contained on each sign, and (2) none of the signs contained the international symbol for towing—a fact that Portzer admitted—or stated the days and hours of towing enforcement.[8]

---

[8]Roadrunners' brief fails to address the international symbol for towing or the days and hours of towing enforcement, and instead states in a conclusory manner that its signs complied with Subchapter G.  Roadrunners also mistakenly argues that Section 2308.305, titled "Individual Parking Restrictions in Restricted Area," blesses the noncompliance with Section 2308.301.  *See* TEX. OCC. CODE ANN. § 2308.305.  Section 2308.305 does not apply because nothing shows that the Lot had spaces within it that were subject to different restrictions or that any particular space was "reserved for a particular unit number, person, or type of person."  TEX. OCC. CODE ANN.

We conclude that legally and factually sufficient evidence supported the trial court's conclusion that Roadrunners did not comply with Subchapter G of the Act. As a result, Roadrunners was not authorized to tow Hargrove's vehicle under the Act.[9]

## V.    Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Justice


Date Submitted:     March 31, 2021
Date Decided:       April 23, 2021

---

§ 2308.305(c). Even so, Section 2308.305 allows for additional signage "impos[ing] further specific parking restrictions in an area to which the signs apply for individual spaces" only when the "parking facility owner . . . complies with Sections 2308.301 and 2308.302." TEX. OCC. CODE ANN. § 2308.305(a).

[9]Because our resolution of the issues in this opinion is dispositive, we need not address Roadrunners' additional challenges to the trial court's findings of fact and conclusions of law.